Citation Nr: 1527860 
Decision Date: 06/29/15 Archive Date: 07/09/15

DOCKET NO. 08-33 242 ) DATE
 )
 )

On appeal from the
Department of Veterans Affairs Regional Office in Roanoke, Virginia


THE ISSUES

1. Entitlement to service connection for a heart disability. 

2. Entitlement to service connection for a left leg disability, to include as secondary to service-connected lumbar spine disability. 

3. Entitlement to service connection for right ear hearing loss. 

4. Entitlement to service connection for tinnitus. 

5. Entitlement to service connection for a right hip disability, to include as secondary to service-connected lumbar spine disability. 

6. Entitlement to service connection for a right knee disability, to include as secondary to service-connected lumbar spine disability. 

7. Entitlement to service connection for an acquired psychiatric disorder, to include posttraumatic stress disorder (PTSD). 

8. Entitlement to an increased rating for a lumbar spine disability, currently rated as 40 percent disabling. 


REPRESENTATION

Appellant represented by: Robert W. Gillikin, Attorney


WITNESSES AT HEARING ON APPEAL

Appellant and private nurse, L.H.


ATTORNEY FOR THE BOARD

Jennifer Hwa, Counsel


INTRODUCTION

The Veteran served on active duty from April 1966 to April 1968. He also served in the Virginia National Guard from May 1980 to October 1992. 

This matter comes before the Board of Veterans' Appeals (Board) on appeal from a March 2008 rating decision issued by the Department of Veterans Affairs (VA) Regional Office (RO) in Roanoke, Virginia, which declined to reopen the Veteran's claims of service connection for a heart disability and a left leg disability; denied claims of service connection for right ear hearing loss, tinnitus, a right hip disability, a right knee disability, and an acquired psychiatric disorder; and continued a 40 percent rating for a lumbar spine disability. 

In December 2011, the Veteran testified before the undersigned at a video conference hearing. A copy of the transcript has been associated with the claims file. 

In June 2012, the Board reopened the Veteran's claims of service connection for a heart disability and left leg disability and remanded those claims, along with the other claims on appeal, for additional development. 

At the time of the June 2012 Board remand, the Veteran had been represented by Brooks McDaniel. Subsequently, in August 2012, the Veteran submitted another VA Form 21-22a (Appointment of Individual as Claimant's Representative) in which he designated Robert W. Gillikin as his representative. Therefore, the Board recognizes this change in representation. 

The Board notes that, in addition to the paper claims file, there is a paperless, electronic record associated with the Veteran's claims (including Virtual VA and Veterans Benefits Management System (VBMS)). A review of the documents in such file reveals that certain documents, including VA and private medical records dated from February 2011 to January 2015 and the February 2015 supplemental statement of the case, are potentially relevant to the issues on appeal. Thus, the Board has considered these electronic records in its adjudication of the Veteran's case. Any future consideration of this appellant's case should take into consideration the existence of this electronic record.
 
The issue(s) of entitlement to service connection for a heart disability, left leg disability, right ear hearing loss, tinnitus, a right hip disability, and a right knee disability are addressed in the REMAND portion of the decision below and are REMANDED to the Agency of Original Jurisdiction (AOJ).






FINDINGS OF FACT

1. The competent and probative evidence shows that the Veteran does not have an acquired psychiatric disorder, to include PTSD, that is etiologically related to service. 

2. For the entire appeal period, the Veteran's lumbar spine disability has been manifested by pain, with forward flexion limited, at worst, to 50 degrees, without evidence of ankylosis of the spine, incapacitating episodes, or neurological impairment related to his service-connected lumbar spine disability.


CONCLUSIONS OF LAW

1. An acquired psychiatric disorder, including PTSD, was not incurred in or aggravated by service. 38 U.S.C.A. §§ 1101, 1110 (West 2014); 38 C.F.R. §§ 3.303, 3.304 (2014). 

2. For the entire appeal period, the criteria for a rating in excess of 40 percent for a lumbar spine disability have not been met. 38 U.S.C.A. §§ 1155, 5107 (West 2014); 38 C.F.R. § 4.71a, Diagnostic Code 5243 (2014).


REASONS AND BASES FOR FINDINGS AND CONCLUSIONS

Veterans Claims Assistance Act of 2000

The Veterans Claims Assistance Act of 2000 (VCAA), Pub. L. No. 106-475, 114 Stat. 2096 (Nov. 9, 2000) (codified at 38 U.S.C.A. §§ 5100, 5102, 5103, 5103A, 5106, 5107, and 5126 (West 2014)) redefined VA's duty to assist a claimant in the development of a claim. VA regulations for the implementation of the VCAA were codified as amended at 38 C.F.R. §§ 3.102, 3.156(a), 3.159, and 3.326(a) (2014).

The notice requirements of the VCAA require VA to notify the claimant of any evidence that is necessary to substantiate the claim, as well as the evidence VA will attempt to obtain and which evidence he is responsible for providing. 38 C.F.R. § 3.159(b) (2014). The requirements apply to all five elements of a service connection claim: veteran status, existence of a disability, a connection between a veteran's service and the disability, degree of disability, and effective date of the disability. Dingess/Hartman v. Nicholson, 19 Vet. App. 473 (2006). VCAA notice must be provided to a claimant before the initial unfavorable decision on a claim for VA benefits by the agency of original jurisdiction (in this case, the RO). Id.; see also Pelegrini v. Principi, 18 Vet. App. 112 (2004). However, the VCAA notice requirements may be satisfied if any errors in the timing or content of such notice are not prejudicial to the claimant. See Pelegrini, 18 Vet. App. at 121.

In an April 2007 letter issued prior to the decision on appeal, the Veteran was provided notice regarding what information and evidence is needed to substantiate his claims for service connection and increased rating, as well as what information and evidence must be submitted by the Veteran and what information and evidence will be obtained by VA. The April 2007 letter also advised the Veteran of the necessity of providing medical or lay evidence demonstrating the level of disability and the effect that the disability has on his employment. The notice also provided examples of pertinent medical and lay evidence that the Veteran may submit (or ask the Secretary to obtain) relevant to establishing entitlement to a disability evaluation. See Vazquez-Flores v. Shinseki, 580 F.3d 1270 (Fed. Cir. 2009) (VCAA notice in a claim for increased rating need not be "veteran specific"). The April 2007 letter further advised the Veteran of how effective dates are assigned, and the type of evidence which impacts those determinations.

The record also reflects that VA has made reasonable efforts to obtain relevant records adequately identified by the Veteran. Specifically, the information and evidence that have been associated with the claims file include the Veteran's service treatment and personnel records, VA and private medical records, VA examination reports, hearing testimony, lay statements, medical treatises, and the Veteran's statements. The Board notes that in July 2012, the RO issued a Formal Finding of Unavailability of the Veteran's Social Security Administration (SSA) records, and therefore, no further action is necessary to obtain these records. The Board finds that the March 2014 VA examination is adequate because the examiner reviewed the Veteran's claims file, was informed of the relevant facts regarding the Veteran's medical history, and considered all relevant evidence of record when rendering the medical opinion regarding the etiology of the disability. The Board finds that the April 2007, August 2011, and January 2015 VA examinations are adequate because the examiners considered the relevant facts regarding the Veteran's medical history and addressed the relevant criteria regarding the current level of severity of his service-connected lumbar spine disability. 

Moreover, with respect to the Veteran's December 2011 Board hearing, the Veteran, through his testimony, demonstrated that he had actual knowledge of the elements necessary to substantiate his claims and volunteered his treatment history. Additionally, neither the Veteran nor his representative has asserted that VA failed to comply with 38 C.F.R. § 3.103(c)(2) (2014), nor has he identified any prejudice in the conduct of the Board hearing. As such, the Board finds that no further action is necessary. See Bryant v. Shinseki, 23 Vet. App. 488 (2010) (requiring that the VLJ who chairs a hearing must comply with 38 C.F.R. § 3.103(c)(2) by fully explaining the issues and suggesting the submission of evidence that may have been overlooked). 

Additionally, the prior remand instructions were substantially complied with. Instructions pertinent to the claims being decided included obtaining the Veteran's SSA records, obtaining the Veteran's National Guard service records, requesting updated stressor information from the Veteran, obtaining updated VA and private medical records, and scheduling the Veteran for a VA examination to determine the etiology of his acquired psychiatric disorders. In response, the RO/AMC obtained the Veteran's updated medical records and National Guard records. The RO/AMC attempted to obtain the Veteran's SSA records and issued a July 2012 Formal Finding of Unavailability of SSA Records. The RO/AMC requested updated stressor information from the Veteran in July 2012 correspondence. Finally, the Veteran was scheduled for a March 2014 VA examination to determine the etiology of his acquired psychiatric disorders. Accordingly, the Board finds that there has been substantial compliance with the prior remand instructions and no further action is necessary. See D'Aries v. Peake, 22 Vet. App. 97 (2008) (holding that only substantial, and not strict, compliance with the terms of a Board remand is required pursuant to Stegall v. West, 11 Vet. App. 268 (1998)). 

As discussed above, the VCAA provisions have been considered and complied with. The Veteran was notified and aware of the evidence needed to substantiate his claims, the avenues through which he might obtain such evidence, and the allocation of responsibilities between himself and VA in obtaining such evidence. The Veteran was an active participant in the claims process by providing evidence and argument. Thus, he was provided with a meaningful opportunity to participate in the claims process and has done so. Any error in the sequence of events or content of the notices is not shown to have any effect on the case or to cause injury to the Veteran. Therefore, any such error is harmless and does not prohibit consideration of these matters on the merits. See Dingess, supra; see also ATD Corp. v. Lydall, Inc., 159 F.3d 534, 549 (Fed. Cir. 1998).

Analysis

The Board has reviewed all of the evidence in the Veteran's claims file. Although the Board has an obligation to provide adequate reasons and bases supporting this decision, there is no requirement that the evidence submitted by the appellant or obtained on his behalf be discussed in detail. Rather, the Board's analysis below will focus specifically on what evidence is needed to substantiate the claims and what the evidence in the claims file shows, or fails to show, with respect to the claims. See Gonzales v. West, 218 F.3d 1378, 1380-81 (Fed. Cir. 2000) and Timberlake v. Gober, 14 Vet. App. 122, 128-30 (2000).

Service Connection 

Under applicable law, service connection is warranted where the evidence of record establishes that a particular injury or disease resulting in disability was incurred in the line of duty in the active military service or, if pre-existing such service, was aggravated thereby. 38 U.S.C.A. § 1110 (West 2014); 38 C.F.R. § 3.303(a) (2014). Generally, in order to prove service connection, there must be competent, credible evidence of (1) a current disability, (2) in-service incurrence or aggravation of an injury or disease, and (3) a nexus, or link, between the current disability and the in-service disease or injury. See, e.g., Davidson v. Shinseki, 581 F.3d 1313 (Fed. Cir. 2009); Pond v. West, 12 Vet. App. 341 (1999).

Moreover, where a veteran served continuously for ninety (90) days or more during a period of war, or during peacetime service after December 31, 1946, and psychosis becomes manifest to a degree of 10 percent within one year from the date of termination of such service, such disease shall be presumed to have been incurred in service, even though there is no evidence of such disease during the period of service. This presumption is rebuttable by affirmative evidence to the contrary. 38 U.S.C.A. §§ 1101, 1110, 1112, 1113, 1137 (West 2014); 38 C.F.R. §§ 3.307, 3.309 (2014).

Service connection for PTSD requires medical evidence diagnosing the condition in accordance with 38 C.F.R. § 4.125(a) (under the criteria of DSM-IV), a link, established by medical evidence, between current symptoms and an in-service stressor, and credible supporting evidence that the claimed in-service stressor occurred. 38 C.F.R. § 4.125 (2014). VA considers diagnoses of mental disorders in accordance with the American Psychiatric Association : Diagnostic and Statistical Manual of Mental Disorders, Fourth Edition (1994) (DSM-IV). 

The Board notes that the DSM-IV has been recently updated with a Fifth Edition (DSM-V). Effective August 4, 2014, VA issued an interim rule amending the portion of its Schedule for Rating Disabilities dealing with mental disorders and its adjudication regulations to refer to certain mental disorders in accordance with DSM-V. The provisions of the interim final rule only apply, however, to all applications for benefits that are received by VA or that are pending before the agency of original jurisdiction on or after August 4, 2014. 

If the veteran did not serve in combat, or if the claimed stressor is not related to combat, there must be independent evidence to corroborate a veteran's statement as to the occurrence of the claimed stressor. See Doran v. Brown, 6 Vet. App. 283, 288-89 (1994). Generally, the Veteran's testimony alone cannot establish the occurrence of a non-combat stressor. See Dizoglio v. Brown, 9 Vet. App. 163, 166 (1996). Furthermore, an opinion by a medical health professional based on post-service examination of the Veteran cannot be used to establish the occurrence of a stressor. See Moreau v. Brown, 9 Vet. App. 389, 395-96 (1996). 

The Veteran contends that he has an acquired psychiatric disorder, to include PTSD, due to fire exchange while serving in Panama during the Panama Conflict. 

Service treatment records for the Veteran's period of active service from April 1966 to April 1968 and for his period of National Guard service from May 1980 to October 1992 are negative for any complaints, treatment, or diagnoses of any psychiatric disorders. 

VA and private medical records dated from March 1995 to March 2012 show that the Veteran received intermittent treatment for depression, anxiety, and PTSD. 

In June 2007, the RO issued a Formal Finding on a Lack of Information Required to Verify Stressors in Connection with a PTSD Claim. The Veteran had not returned the VA Form 21-0781, Statement in Support of Claim for PTSD, nor had he provided medical evidence that he had been diagnosed with PTSD. Moreover, the Veteran's service personnel records did not list any medals that would concede that the Veteran had combat exposure. 

In a December 2011 letter, the Veteran's private nurse indicated that the Veteran had served in Germany and during the Panama Conflict, in which he had been required to protect himself and others using small arms fire. He had feared for his life. The Veteran had reported sleeping only 4 hours a night and that his wife had informed him of his having nightmares about the war. He stated that he suffered from depression and anxiety and was currently taking medication for these conditions. The Veteran's nurse provided the same abovementioned testimony at a December 2011 Board hearing. 

The Veteran also submitted a December 2011 lay statement from his wife in support of his claim. The Veteran's wife reported that the Veteran had "PTSD type symptoms." She stated that on some nights, he would fight as if he were still in the military. He would awaken her by kicking and swinging his arms and appearing frightened. She indicated that she was frightened for her own safety, but that most of the time, she was able to awaken him. She also maintained that he had jumped out of the bed and fallen and hit his head on the night stand several times. 

In December 2011, the Veteran testified before the Board at a video conference hearing. Testimony revealed, in pertinent part, that the Veteran could not remember the date that he served in Panama. He testified that he had been in Panama after 1968 during the dispute that the United States had against Panama to take back the Panama Canal. He reported that while he was stationed in Panama to defend the canal, the Panamanians had fired some shots at his unit, but his unit had not engaged in firing back because the command had not been given to engage in fire. He also stated that he was currently receiving medication for PTSD, anxiety, and depression. 

Pursuant to the Board's June 2012 remand, the RO/AMC requested updated stressor information from the Veteran in July 2012 correspondence. In February 2014, the RO issued a memorandum finding that the Veteran's claimed PTSD stressor of fire exchange while in Panama during conflicts was not conceded. Service personnel records verified that the Veteran had served in Panama on July 2, 1988. Based on the available evidence, the Veteran had not been in Panama during the various time periods that he had suggested. The RO indicated that there had been hostilities in Panama in May 1969, June 1969, May 1989, and December 1989. However, there had been nothing of significance to research that took place either in 1984 to 1985 or in 1988 during the time period that the Veteran was confirmed to have been in Panama. The Veteran had not provided any evidence for the time frames that he had suggested, and his personnel records had stated a different time period when there had been no noted hostilities of record. The Veteran had not specified anything beyond the fire exchange incident, nor had he reported his duties or stated that he had been present during more than one time period. Therefore, the RO determined that the Veteran's stressors could not be conceded as the evidence stood. The Veteran was noted to have not provided further detailed statements or evidence, despite having been given several opportunities to do so. 

On VA examination in March 2014, the examiner reviewed the Veteran's entire claims file. Regarding the period of service from April 1966 to April 1968, the Veteran reported that he had been in Germany in October 1966 for 18 months and that he had loved it there. He stated that he had gone to Norway for mountain training between 1980 and 1985 and that he had joined the Army National Guard for extra income in 1970. He indicated that he had gone to Panama "in the 80's" for 3 weeks to defend the Panama Canal, but that he did not remember exactly when it had been. He only remembered that it had been "during the Panama conflict." He did not remember where his barracks had been located and indicated that they had "went up the Panama Canal" and that "at the end of the Canal," they had camped out. He maintained that he had heard "what was recorded as gunshot" but had not returned fire. He had heard the gunshot sounds off in the distance but had not known if his unit had been specifically targeted. He had been told to take cover by his commanding officer. The Veteran reported that he had begun taking anti-depressants prescribed by his family doctor in 1988 or 1989 after a heart attack, but that he was unclear about why he had been taking anti-depressants at the time. The examiner noted the Veteran's May 1995 diagnosis of depression due to some distress he had been experiencing in response to his medical problems and the tests and procedures he had been undergoing. The Veteran indicated that he had not thought he had been depressed at that time, but that his "doctors know best." He had been consistently prescribed anti-depressant medication since that time despite denying depression. The Veteran currently categorically denied depression and did not report any symptoms suggestive of a diagnosis of depression. He led a full, rich life with good family relationships, a "great" marriage, and an active social life. He was active in the church where he was pastor. He denied low mood, sleep problems, concentration problems, and symptoms associated with any other mental disorder. 

After examination, the examiner found that the Veteran had marked difficulty in identifying his dates of service in Panama, as well as the specific dates of the incident he was reporting. Due to the lack of specific information provided by the Veteran, the examiner was unable to corroborate the stressor. Therefore, she concluded that a PTSD diagnosis could not be assigned. Further, she explained that even if the Veteran had been able to provide specific dates and locations, it was highly doubtful that his reported event would have met the severity level necessary to meet Criterion A for a PTSD diagnosis. She indicated that since the Veteran did not know if his position in Panama had been targeted, no bullets had landed near him, and he had heard gunshot off in the distance, this stressor did not qualify as meeting Criterion A for a PTSD diagnosis either for DSM-IV or DSM-V. She found that while hearing gunshots may be distressing, if one did not know if he was being targeted and did not have evidence that it had been occurring, this did not reach the level of severity required for Criterion A under DSM-IV or DSM-V. The examiner determined that the Veteran did not meet the diagnostic criteria for PTSD under DSM-IV or DSM-V, nor did he meet the diagnostic criteria for any DSM-IV or DSM-V mental disorder. She reiterated that because the Veteran was unable to provide a verifiable time frame or location for his reported small arms fire incident, the stressor was not conceded. She concluded that it was less likely than not that the Veteran had an acquired psychiatric disorder that was incurred in or caused by the claimed in-service injury, event, or illness because the Veteran did not have a DSM-IV or DSM-V mental disorder. 

Regarding an existing August 5, 2009 VA diagnosis of PTSD, the examiner noted that this diagnosis had been assigned subsequent to an incident where the Veteran accidentally hit and killed a woman while driving on an unlit street. The progress note documented symptoms of avoidance of driving at night, avoidance of driving on the road where the incident occurred, and becoming distressed and emotional when discussing the incident. The examiner found that this incident and the subsequent emotional problems that resulted from it were not related to or occurring during the Veteran's military service. With respect to the existing December 2011 diagnosis of PTSD provided by the Veteran's private nurse, the examiner explained that the nurse had not had any corroboration of the reported "small arms fire" incident, including the lack of any time frame beyond "during the Panama conflict." Therefore, Criterion A of the December 2011 diagnosis of PTSD could not have been conceded. The examiner also found that the symptoms reported by the Veteran's wife in her December 2011 lay statement were inadequate to diagnose PTSD using either the DSM-IV or DSM-V criteria. 

Regarding diagnoses of other psychiatric disorders in the record, the examiner noted that although the Veteran had apparently been taking anti-depressant medication since 1995, no diagnosis of depression was found in the problem list in the Veteran's VA medical records. She also indicated the Veteran's reports that he did not experience depression or anxiety and that he did not feel he needed to be taking anti-depressant medication. Despite being treated for depression since at least 1995 and perhaps as early as the late 1980's, the Veteran denied having any current symptoms of depression and questioned whether he had been depressed in the past. The examiner also found that there was no evidence of psychosis in the record. 

An evaluation of the probative value of medical opinion evidence is based on the medical expert's personal examination of the patient, the examiner's knowledge and skill in analyzing the data, and the medical conclusion reached. The credibility and weight to be attached to such opinions are within the province of the Board as adjudicators. Guerrieri v. Brown, 4 Vet. App. 467 (1993); Gabrielson v. Brown, 7 Vet. App. 36 (1994). Greater weight may be placed on one physician's opinion over another depending on factors such as reasoning employed by the physicians and whether or not and the extent to which they reviewed prior clinical records and other evidence. Gabrielson v. Brown, 7 Vet. App. 36 (1994). The probative value of a medical opinion is generally based on the scope of the examination or review, as well as the relative merits of the expert's qualifications and analytical findings, and the probative weight of a medical opinion may be reduced if the examiner fails to explain the basis for an opinion. Sklar v. Brown, 5 Vet. App. 140 (1993). 

The Board notes that the December 2011 private nurse diagnosed the Veteran with PTSD as being due to a stressful event in Panama as reported by the Veteran. However, just because a physician or other health care professional accepted the Veteran's description of his active service experiences as credible and diagnosed the Veteran as suffering from PTSD does not mean the Board is required to grant service connection for PTSD. Wilson v. Derwinski, 2 Vet. App. 614, 618 (1992). 

In this case, the opinion of the December 2011 private nurse was clearly based on her acceptance of the Veteran's reported stressor during service. However, as shown above, the Board finds that the Veteran's reported stressor has not been verified or conceded, given that the Veteran had not provided a verifiable time frame or location for his reported small arms fire incident in Panama. The private nurse's opinion is therefore not probative as it is based on the Veteran's reported history during service, which the Board finds lacking in credibility. See Kowalski v. Nicholson, 19 Vet. App. 171 (2005); Coburn v. Nicholson, 19 Vet. App. 427 (2006) (the Board may reject a medical opinion if the Board finds that other facts present in the record contradict the facts provided by the Veteran that formed the basis for the opinion). An examination that relies on an inaccurate history is inadequate for rating purposes. West, 7 Vet. App. 70, 78. 

However, the March 2014 VA examiner reviewed the claims file, considered the Veteran's lay statements considering his claimed disorder and stressor, examined the Veteran extensively, and provided adequate reasoning and bases for the opinion that the Veteran did not have an acquired psychiatric disorder, to include PTSD, that was due to his period of service. Specifically, the March 2014 examiner determined that because the Veteran was unable to provide a verifiable time frame or location for his reported small arms fire incident, his stressor could not be conceded. Therefore, a PTSD diagnosis could not be assigned, as the Veteran did not meet Criterion A of DSM-IV or DSM-V. Further, she explained that even if the Veteran had been able to provide specific dates and locations for his stressor, it was highly doubtful that his reported event would have met the severity level necessary to meet Criterion A for a PTSD diagnosis. The examiner also explained that the Veteran did not meet the diagnostic criteria for any DSM-IV or DSM-V mental disorder. She further cited the mental disorders that had been referenced in the medical record and either provided reasons for why these diagnoses were invalid and/or determined that the mental disorders were not related to the Veteran's period of service. For these reasons, the opinion by the March 2014 VA examiner is afforded great probative value. 

In addition, a psychosis was not clinically shown to a compensable degree within one year following the Veteran's discharge from service. Indeed, there is no objective evidence that the Veteran has been diagnosed with a psychosis. See 38 C.F.R. § 3.384 (2014). Therefore, service connection is not warranted for an acquired psychiatric disorder on a presumptive basis. See 38 C.F.R. §§ 3.307, 3.309 (2014). 

Although lay persons are competent to provide opinions on some medical issues, see Kahana v. Shinseki, 24 Vet. App. 428, 435 (2011), as to the specific issue in this case, an acquired psychiatric disorder falls outside the realm of common knowledge of a lay person. In this regard, while the Veteran and his wife can competently report the onset and symptoms of depression, any actual diagnosis of an acquired psychiatric disorder, requires objective testing to diagnose, and can have many causes. See Jandreau v. Nicholson, 492 F.3d 1372, 1376-77 (Fed. Cir. 2007) (noting general competence to testify as to symptoms but not to provide medical diagnosis). Whether the symptoms the Veteran experienced in service or following service are in any way related to any current acquired psychiatric disorder requires medical expertise to determine because it involves a complex medical matter. To the extent that the Veteran and his wife believe that he has an acquired psychiatric disorder that is due to his period of service, as lay persons, they are not shown to possess any specialized training in the medical field. The Veteran's and Veteran's wife's opinions as to the etiology of any current acquired psychiatric disorder are not competent evidence, as the nexus question involved in this case requires medical expertise to determine. Id. 

For the reasons set forth above, the Board finds the March 2014 opinion by the March 2014 VA examiner (which was accompanied by detailed supporting rationale) to be of greater probative value than the Veteran's and Veteran's wife's lay contentions regarding the diagnosis and etiology of his acquired psychiatric disorder.

In sum, the Board finds that the competent medical evidence has not shown that the Veteran has an acquired psychiatric disorder that is etiologically related to his active service. Likewise, there is no competent and credible evidence indicating the Veteran had psychosis that manifested to a compensable degree within a year following discharge from service. Accordingly, service connection for an acquired psychiatric disorder, to include PTSD, is not warranted on any basis.

In reaching the conclusions above, the Board has considered the applicability of the benefit of the doubt doctrine. However, as the preponderance of the evidence is against the Veteran's claim, that doctrine is not applicable in the instant appeal. See 38 U.S.C.A. § 5107(b); Ortiz v. Principi, 274 F.3d 1361, 1364 (Fed. Cir. 2001); Gilbert v. Derwinski, 1 Vet. App. 49, 55-57 (1990). 
 
Increased Rating 

Disability ratings are determined by applying the criteria set forth in the VA Schedule for Rating Disabilities (Rating Schedule) and are intended to represent the average impairment of earning capacity resulting from disability. 38 U.S.C.A. § 1155 (West 2014); 38 C.F.R. § 4.1 (2014). Separate diagnostic codes identify the various disabilities. Disabilities must be reviewed in relation to their history. 38 C.F.R. § 4.1. Other applicable, general policy considerations are: interpreting reports of examination in light of the whole recorded history, reconciling the various reports into a consistent picture so that the current rating may accurately reflect the elements of disability, 38 C.F.R. § 4.2 (2014); resolving any reasonable doubt regarding the degree of disability in favor of the claimant, 38 C.F.R. § 4.3 (2014); where there is a question as to which of two evaluations apply, assigning a higher of the two where the disability picture more nearly approximates the criteria for the next higher rating, 38 C.F.R. § 4.7 (2014); and, evaluating functional impairment on the basis of lack of usefulness, and the effects of the disability upon the person's ordinary activity, 38 C.F.R. § 4.10 (2014). See Schafrath v. Derwinski, 1 Vet. App. 589 (1991).

Where entitlement to compensation has already been established and an increase in the disability rating is at issue, the present level of disability is of primary concern. Although a rating specialist is directed to review the recorded history of a disability in order to make a more accurate evaluation, see 38 C.F.R. § 4.2, the regulations do not give past medical reports precedence over current findings. Francisco v. Brown, 7 Vet. App. 55 (1994). Nevertheless, the Board acknowledges that a claimant may experience multiple distinct degrees of disability that might result in different levels of compensation from the time the increased rating claim was filed until a final decision is made. See Fenderson v. West, 12 Vet. App. 119 (1999); see also Hart v. Mansfield, 21 Vet. App. 505 (2007). The analysis in the following decision is therefore undertaken with consideration of the possibility that different ratings may be warranted for different time periods based on the facts found - a practice known as "staged" ratings.

Disability of the musculoskeletal system is primarily the inability, due to damage or inflammation in parts of the system, to perform normal working movements of the body with normal excursion, strength, speed, coordination, and endurance. The functional loss may be due to absence of part or all of the necessary bones, joints and muscles, or associated structures, or to deformity, adhesions, defective innervation, or other pathology, or may be due to pain, supported by adequate pathology and evidenced by visible behavior of the claimant undertaking the motion. Weakness is as important as limitation of motion, and a part which becomes painful on use must be regarded as disabled. See DeLuca v. Brown, 8 Vet. App. 202 (1995); 38 C.F.R. § 4.40 (2014); see also 38 C.F.R. §§ 4.45, 4.59 (2014).

Under 38 C.F.R. § 4.59, painful motion is a factor to be considered with any form of arthritis; however 38 C.F.R. § 4.59 is not limited to disabilities involving arthritis. See Burton v. Shinseki, 25 Vet. App. 1 (2011). The Court also has held that "pain itself does not rise to the level of functional loss as contemplated by VA regulations applicable to the musculoskeletal system." Mitchell v. Shinseki, 25 Vet. App. 32, 38 (2011). Rather, pain may result in functional loss, but only if it limits the ability "to perform the normal working movements of the body with normal excursion, strength, speed, coordination [, or] endurance." Id., quoting 38 C.F.R. § 4.40. 

With respect to the joints, the factors of disability reside in reductions of their normal excursion of movements in different planes. Inquiry will be directed to these considerations: (a) less movement than normal (due to ankylosis, limitation or blocking, adhesions, tendon-tie-up, contracted scars, etc.); (b) more movement than normal (from flail joint, resections, nonunion of fracture, relaxation of ligaments, etc.); (c) weakened movement (due to muscle injury, disease or injury of peripheral nerves, divided or lengthened tendons, etc.); (d) excess fatigability; (e) incoordination, impaired ability to execute skilled movements smoothly; and (f) pain on movement, swelling, deformity or atrophy of disuse. Instability of station, disturbance of locomotion, interference with sitting, standing and weight-bearing are related considerations. 38 C.F.R. § 4.45 (2014). For the purpose of rating disability from arthritis, the lumbar vertebrae are considered groups of minor joints. See 38 C.F.R. § 4.45.

Arthritis shown by X-ray studies is rated based on limitation of motion of the affected joint. When limitation of motion would be noncompensable under a limitation-of-motion code, but there is at least some limitation of motion, a 10 percent rating may be assigned for each major joint so affected. 38 C.F.R. § 4.71a, Diagnostic Codes 5003 (degenerative arthritis) and 5010 (traumatic arthritis). Diagnostic Code 5010 (traumatic arthritis) directs that the evaluation of arthritis be conducted under Diagnostic Code 5003, which states that degenerative arthritis established by X-ray findings will be rated on the basis of limitation of motion under the appropriate diagnostic codes for the specific joint or joints involved. 38 C.F.R. § 4.71a, Diagnostic Code 5010. The limitation of motion must be objectively confirmed by findings such as swelling, muscle spasm, or satisfactory evidence of painful motion. 38 C.F.R. § 4.71a, Diagnostic Code 5010. In the absence of limitation of motion, X-ray evidence of arthritis involving two or more major joint groups with occasional incapacitating exacerbations will warrant a 20 percent rating. The above ratings are to be combined, not added under Diagnostic Code 5003. 38 C.F.R. § 4.71a, Diagnostic Code 5010, Note 1. 

The Veteran contends that he is entitled to a higher disability rating for his lumbar spine disability. Such disability has been rated under 38 C.F.R. § 4.71a, Diagnostic Code 5243, as 40 percent disabling. 

The General Rating Formula for Diseases and Injuries of the Spine provides that, with or without symptoms such as pain (whether or not it radiates), stiffness, or aching in the area of the spine affected by residuals of injury or disease, the following ratings will apply. A 10 percent evaluation requires evidence of forward flexion of the thoracolumbar spine greater than 60 degrees but not greater than 85 degrees; or, combined range of motion of the thoracolumbar spine greater than 120 degrees but not greater than 235 degrees; or, muscle spasm, guarding, or localized tenderness not resulting in abnormal gait or abnormal spinal contour; or, vertebral body fracture with loss of 50 percent or more of the height. A 20 percent evaluation requires evidence of forward flexion of the thoracolumbar spine greater than 30 degrees but not greater than 60 degrees; or, the combined range of motion of the thoracolumbar spine not greater than 120 degrees; or, muscle spasm or guarding severe enough to result in an abnormal gait or abnormal spinal contour, such as scoliosis, reversed lordosis, or abnormal kyphosis. A 40 percent evaluation requires evidence of forward flexion of the thoracolumbar spine to 30 degrees or less; or, favorable ankylosis of the entire thoracolumbar spine. A 50 percent evaluation is warranted for unfavorable ankylosis of the entire thoracolumbar spine. 38 C.F.R. § 4.71a, Diagnostic Code 5237 (2014). Any associated objective neurologic abnormalities should be evaluated separately, under an appropriate diagnostic code. Id. at Note 1.

On VA examination in April 2007, the Veteran complained of low back fatigue, decreased motion, stiffness, and weakness. He reported that he had constant, moderate daily back pain that radiated into the left buttock and into the leg down to the toes. He stated that he had urinary incontinence, urinary urgency, nocturia, erectile dysfunction, numbness, paresthesias, leg or foot weakness, falls, unsteadiness, and dizziness. However, the etiology of these neurological symptoms was noted by the examiner to be unrelated to his lumbar spine disability. The Veteran indicated that he had severe weekly flare-ups that lasted 1 to 2 days. He reported that he was unable to walk or do physical activity during flare-ups. The Veteran used a cane and was unable to walk more than a few yards or sit or stand in one position for more than 15 to 20 minutes. 

Examination revealed antalgic gait, guarding, pain with motion, tenderness, and weakness. Motor examination was normal on the right side, but left hip flexion was 0/5, left knee extension was 1/5, and left ankle dorsiflexion was 4/5. Sensory examination was normal on the right side, but there was absent sensation to vibration and impaired sensation to pin prick on the left side. Reflexes were normal bilaterally. The Veteran had no thoracolumbar spine ankylosis. Range of motion testing showed 50 degrees flexion, 25 degrees extension, 25 degrees left lateral flexion, 20 degrees right lateral flexion, and 20 degrees lateral rotation bilaterally. All ranges of motion had pain. Lasegue's sign was positive bilaterally. The Veteran was diagnosed with degenerative disc disease of L2-L3 and degenerative joint disease of the lumbar spine. 

At an August 2011 VA examination, the Veteran complained of low back decreased motion, stiffness, weakness, and spasm. He reported that his low back pain was worse with walking up and down stairs, bending forward, or sitting/standing for too long. He used a cane and walker and could only walk 2 miles. He did not have any incapacitating episodes of spine disease. He stated that he had a history or urinary urgency, but the etiology of this symptom was found not to be related to his lumbar spine disability. 

Examination revealed abnormal gait, as the Veteran was ambulatory with the assistance of a single-prong cane at a slow pace. There was evidence of spasm. Motor examination, sensory examination and reflexes were normal bilaterally. The Veteran had no thoracolumbar spine ankylosis. Range of motion testing showed 50 degrees flexion, 10 degrees extension, and 20 degrees lateral flexion and rotation bilaterally. All ranges of motion had pain. Following repetitive motion, there was no pain or additional limitation. Lasegue's sign was positive bilaterally. The Veteran was diagnosed with degenerative disc disease at L2-L3. 

In December 2011, the Veteran testified before the Board at a video conference hearing. Testimony revealed, in pertinent part, that the Veteran had low back pain that radiated down his left leg. The Veteran testified that if he bent over and stooped, he could hardly get back up. He reported that if he tried to do a little work outside, such as raking the yard, he would have to lay down for about 2 or 3 days with his feet elevated to relieve the pain. He stated that he took medication for the muscle spasms in his back. He indicated that he used a cane for his back and left leg. He maintained that he could stand for a certain amount of time, but he then had to sit down because his left leg would give out on him and cause him to fall. The Veteran also testified that he experienced incapacitating episodes more than 6 weeks in a year, but that he had not explained this to the August 2011 VA examiner because the examiner had not asked him about incapacitating episodes. 

VA and private medical records dated from January 2007 to January 2015 show that the Veteran received intermittent treatment for a lumbar spine disability. He experienced low back pain. In a July 2014 VA treatment report, the Veteran complained of low back and left lower extremity pain. He reported that he had suffered a stroke on the left side at some point in 2007, which had also limited his left-sided extremity strength, but he managed to walk with a walker or cane. He stated that since he had slipped and fallen in April 2014, he had noticed some increased intensity of low back and lower extremity pain, but there had been no significant change in the nature of the pain. He indicated that his pain was primarily in the lower lumbar region, more on the left side and extending into the left hip and proximal thigh and occasionally to the left calf. He maintained that his continuous pain was least in intensity when he was sitting quietly or lying down and most in intensity when he was exercising or walking. He expressed that he had some decreased sensation of the left lower extremity for a long time, but denied any bowel or bladder incontinence. A June 2014 MRI revealed degenerative disc changes throughout the lumbar spine and facet joint arthrosis at L5-S1 and L4-L5. The physician reported that review of the MRI showed significant atrophy of the posterior lumbar muscles in the lower lumbar spine, more on the right side than the left. Neurological examination revealed normal tone and strength in the right lower extremity and poor effort and strength throughout the left lower extremity of 2/5. Deep tendon reflexes were symmetrical, and there were no involuntary movements. Sensory examination indicated that there was some blunting of sensation to touch in the left lower extremity diffusely throughout and in the left half of the face and left arm to some extent. The Veteran had a discrete tenderness over the lower lumbar facet joints bilaterally without any evidence of paraspinal muscle spasms. The physician diagnosed the Veteran with chronic lower back and proximal left lower extremity pain clinically secondary to facet joint disease. 

On VA examination in January 2015, the Veteran was noted to have had a stroke with left-sided weakness. He also fell 1 year ago and injured his back, and since then he had experienced worsening back pain with pain on the left. The Veteran complained of flare-ups that occurred 2 to 3 times a month, lasted 1 to 2 days, were a 9/10 in severity, and impacted his working in the yard and lifting. The examiner found that pain, weakness, fatigability, or incoordination did not significantly limit functional ability with flare-ups. The Veteran reported functional impairment of having difficulty walking. Examination revealed that the Veteran occasionally used a cane for locomotion due to his back condition. Range of motion testing was noted to be normal. There was pain on forward flexion. Upon repetitive motion, there was no additional loss of function or range of motion. Although pain was noted on examination, it did not result in or cause functional loss. The examiner also determined that pain, weakness, fatigability, or incoordination did not significantly limit functional ability with repeated use over a period of time. Motor examination was normal on the right side, but 4/5 for left hip flexion, left knee extension, left ankle plantar flexion and dorsiflexion, and left great toe extension. Sensory examination was normal on the right side, but there was decreased sensation to light touch on the left lower leg, ankle, foot, and toes. Reflexes were normal on the right side and hyperactive without clonus on the left side. Straight leg raising was negative bilaterally. The Veteran had no thoracolumbar spine ankylosis. The examiner found that the Veteran did not have any signs or symptoms of radiculopathy. Although the Veteran was noted to have intervertebral disc syndrome of the lumbar spine, the examiner determined that the Veteran had not had any episodes of acute signs or symptoms due to intervertebral disc syndrome that required bed rest prescribed by a physician and treatment by a physician in the past 12 months. The Veteran was diagnosed with degenerative arthritis of the thoracolumbar spine and degenerative disc disease of the lumbar spine. The examiner reported that although the Veteran had left leg pain, based on the negative straight leg raise testing and the fact that the June 2014 MRI findings were on the right side instead of the left side, the left leg pain was not radicular. Instead, the examiner found that the left leg pain was secondary to the Veteran's stroke. 

The objective findings of record do not reflect evidence of unfavorable ankylosis of the entire thoracolumbar spine or entire spine. 38 C.F.R. § 4.71a, Diagnostic Code 5243. Indeed, although flexion was limited, at worst, to 50 degrees on VA examination in April 2007 and August 2011, no ankylosis was found at the April 2007, August 2011, and January 2015 VA examinations. There is also no evidence that the Veteran's range of motion was additionally limited by pain, fatigue, weakness, incoordination, or lack of endurance after three repetitions. Thus, even considering the Veteran's subjective complaints of pain, the medical evidence of record does not support any additional limitation of function or motion in response to repetitive motion that would support an evaluation in excess of the 40 percent assigned during the appeal period. See DeLuca, supra; Mitchell, supra; 38 C.F.R. §§ 4.40,4.45, 4.59. 

Although the Veteran alleged at his March 2011 Board hearing that he had experienced incapacitating episodes of intervertebral disc syndrome for more than 6 weeks in a 12 month period, the Board finds that there is no objective evidence of any incapacitating episodes of intervertebral disc syndrome. An "incapacitating episode" for purposes of Diagnostic Code 5243 is a period of acute signs and symptoms due to intervertebral disc syndrome that requires bed rest prescribed by a physician and treatment by a physician. In this case, the Board acknowledges the Veteran's statements that he has to lie down with his feet elevated to relieve back pain when the pain has been aggravated. However, there is no evidence that a physician had prescribed bed rest to the Veteran for his intervertebral disc syndrome at any time during all periods on appeal. Indeed, although the Veteran testified at his March 2011 hearing that he had not explained his incapacitating episodes to the August 2011 VA examiner because the examiner had not asked him about them, at a subsequent January 2015 VA examination, the examiner specifically determined that the Veteran had not had any episodes of acute signs or symptoms due to intervertebral disc syndrome that required bed rest prescribed by a physician and treatment by a physician in the past 12 months. Accordingly, an increased evaluation of the Veteran's disability pursuant to Diagnostic Code 5243 based on incapacitating episodes is not warranted. See 38 C.F.R. § 4.71a. 

With regard to Note (1) of the General Rating Formula for Diseases and Injuries of the Spine, the Board acknowledges that the Veteran has reported neurological symptomatology that he believes is related to his low back disability, such as radiating pain down his left side, urinary symptoms, numbness, weakness, paresthesias, and falls. However, the April 2007, August 2011, and January 2015 VA examiners found that the etiology of the Veteran's neurological symptoms was not related to his lumbar spine disability. The Board notes that a July 2014 VA physician found that the Veteran had chronic lower back and proximal left lower extremity pain clinically secondary to facet joint disease. However, the January 2015 VA examiner clarified that based on the negative straight leg raise testing and the fact that the June 2014 MRI findings were on the right side instead of the left side (which had also been noted by the July 2014 VA physician), the Veteran's left leg pain was not radicular. Instead, the examiner found that the left leg pain was secondary to the Veteran's stroke (which had occurred in 2007). As the medical evidence fails to show any neurological symptomatology specifically related to the Veteran's lumbar spine disability, the Board finds that a separate rating for the neurological manifestations of the Veteran's lumbar spine disability is not warranted at this time. 38 C.F.R. §§ 4.71a, General Rating Formula for Diseases and Injuries of the Spine, Note (1), 4.124a, Diagnostic Code 8520 (2014). 

The Veteran is competent to report on symptoms and credible to the extent that he believes he is entitled to a higher rating. His competent and credible lay evidence, however, is outweighed by competent and credible medical evidence that evaluates the true extent of any impairment attributable to the service-connected disability based on objective data coupled with the lay complaints. In this regard, the Board notes that the VA examiners have the training and expertise necessary to administer the appropriate tests for a determination of the type and degree of the impairment associated with the Veteran's complaints. For these reasons, greater evidentiary weight is placed on the examination findings in regard to the type and degree of impairment. The symptomatology noted in the medical and lay evidence has been adequately addressed by the evaluation assigned and do not more nearly approximate the criteria for a higher evaluation at any time during all relevant periods on appeal. See 38 C.F.R. § 4.71a, Diagnostic Codes 5003, 5010, 5243 (2014); see also Fenderson, supra.

The Board has also considered whether the Veteran's service-connected lumbar spine disability presents an exceptional or unusual disability picture as to render impractical the application of the regular schedular standards such that referral to the appropriate officials for consideration of extraschedular ratings is warranted. See 38 C.F.R. § 3.321(b)(1) (2014); Bagwell v. Brown, 9 Vet. App. 337, 338-39 (1996). The threshold factor for extraschedular consideration is a finding that the evidence before VA presents such an exceptional disability picture that the available schedular evaluations for that service-connected disability are inadequate. See Fisher v. Principi, 4 Vet. App. 57, 60 (1993) ("[R]ating schedule will apply unless there are 'exceptional or unusual' factors which render application of the schedule impractical."). 

Here, the rating criteria reasonably describe the Veteran's disability level and symptomatology, and provide for higher ratings for additional or more severe symptomatology than is shown by the evidence. The Veteran's 40 percent rating contemplated his subjective complaints of pain as well as his functional impairment. There was no evidence that his lumbar spine disability was manifested by ankylosis or incapacitating episodes. Therefore, the Veteran's subjective complaints were included in the 40 percent rating. Regarding any neurological manifestations of his lumbar spine disability, while the Veteran has made neurological complaints and experienced objective neurological symptoms, there has been no evidence that the Veteran's neurological abnormalities upon examination were related to his lumbar spine disability. 
 
The Veteran's disability picture is contemplated by the rating schedule, and the assigned schedular evaluation is, therefore, adequate. See Thun v. Peake, 22 Vet. App. 111, 115 (2008). The Veteran has not described any unusual or exceptional features of his disability. Consequently, referral for extraschedular consideration is not warranted.

The Board notes that under Johnson v. McDonald, 762 F.3d 1362 (Fed. Cir. 2014), a veteran may be awarded an extraschedular rating based upon the combined effect of multiple conditions in an exceptional circumstance where the evaluation of the individual conditions fails to capture all the service-connected disabilities experienced. However, in this case, after applying the benefit of the doubt under Mittleider v. West, 11 Vet. App. 181 (1998), there are no additional service-connected disabilities that have not been attributed to a specific service-connected condition. Accordingly, this is not an exceptional circumstance in which extraschedular consideration may be required to compensate the Veteran for a disability that can be attributed only to the combined effect of multiple conditions. 

In reaching the above conclusions, the Board has considered the applicability of the benefit of the doubt doctrine. See 38 U.S.C.A. § 5107(b); Ortiz v. Principi, 274 F.3d 1361, 1364 (Fed. Cir. 2001); Gilbert v. Derwinski, 1 Vet. App. 49, 55-57 (1990). 


ORDER

Service connection for an acquired psychiatric disorder, to include PTSD, is denied. 

A rating in excess of 40 percent for a lumbar spine disability is denied. 


REMAND

Although the Board sincerely regrets the additional delay, after a close review of the record, further development is needed prior to disposition of the claims for service connection for a heart disability, a left leg disability, right ear hearing loss, tinnitus, a right hip disability, and a right knee disability. 

Regarding the heart disability, the Veteran alleges that this disability is due to his period of National Guard service. With respect to the left leg disability, right hip disability, and right knee disability, the Veteran contends that these disabilities are secondary to his service-connected lumbar spine disability. 

Active military, naval, or air service includes any period of active duty for training (ACDUTRA) during which the individual concerned was disabled from a disease or injury incurred or aggravated in the line of duty. 38 U.S.C.A. § 101(21) and (24) (West 2014); 38 C.F.R. § 3.6(a) (2014). ACDUTRA is, inter alia, full-time duty in the Armed Forces performed by Reserves for training purposes, and includes full-time duty performed by members of the National Guard of any state. 38 U.S.C.A. § 101(21), (22) (West 2014); 38 C.F.R. § 3.6(c)(1) (2014). Active military, naval, or air service also includes any period of inactive duty for training (INACDUTRA) during which the individual concerned was disabled or died from an injury incurred or aggravated in the line of duty, or from an acute myocardial infarction, cardiac arrest, or a cerebrovascular accident occurring during such training. 38 U.S.C.A. § 101(24) (West 2014); 38 C.F.R. § 3.6(a) (2014). INACDUTRA means, inter alia, duty other than full-time duty prescribed for Reserves or the National Guard of any state. 38 U.S.C.A. § 101(23) (West 2014); 38 C.F.R. § 3.6(d) (2014). 

As the Veteran is alleging that his heart disability was due to myocardial infarctions that occurred during his periods of ACDUTRA and INACDUTRA, the distinction between whether the Veteran had ACDUTRA or INACDUTRA is not crucial in this case because the regulations provide for service connection for myocardial infarctions incurred during either type of duty training. See 38 U.S.C.A. §§ 101(21), (22), (24) (West 2014); 38 C.F.R. §§ 3.6(a), (c)(1) (2014). 

Service treatment records from the Veteran's period of active service from April 1966 to April 1968 are negative for any complaints, diagnoses, or treatment of any heart disorder. 

Service treatment records from the Veteran's National Guard service show that the Veteran received treatment for myocardial infarctions in September 1989 and November 1991. Post-service VA and private medical records show that the Veteran received intermittent treatment for coronary artery disease and hypertension. Given the above, the Veteran should be afforded an appropriate VA examination with a medical opinion concerning whether the Veteran's heart disability arose during service or is otherwise related to any incident of service. See McLendon v. Nicholson, 20 Vet. App. 79 (2006). 

On VA examination in February 2015, the VA examiner reviewed the Veteran's entire claims file. He noted that he had not interviewed and examined the Veteran because it was not required for purposes of rendering his opinions. The examiner opined that the Veteran's left knee, left hip, and right hip conditions were less likely as not proximately due to or the result of the Veteran's degenerative joint disease of the lumbosacral spine. He explained that the Veteran's left knee, left hip, and right hip conditions were that of degenerative arthritis, and that these conditions were a function of chronic wear and tear and aging. He indicated that there was no biomechanical mechanism for a spinal condition to result in these degenerative conditions. He stated that for this to occur, increased sheer forces and increased speed across the joints would need to occur, which was the opposite of the type of forces that occurred in people with severe arthritis of the spine. 

With respect to the left leg disability, the Board notes that although the February 2015 VA examiner provided an opinion and rationale regarding whether the Veteran's left leg disability was due to his lumbar spine disability, he provided no opinion regarding whether the Veteran's left leg disability was aggravated by his lumbar spine disability. 38 C.F.R. § 3.310 (2014); Allen v. Brown, 7 Vet. App. 439 (1995). Additionally, service treatment records show that the Veteran slipped and fell on his back in August 1989 during his National Guard service. After getting up from his fall, he had experienced sharp pains in his left leg. His left leg started to feel numb when he started marching the next day. Additionally, in May 1991, the Veteran felt a sharp pain in his left foot and leg during a field exercise. Post-service private and VA medical records show that the Veteran received intermittent treatment for a left leg disability (to include the left knee). However, the February 2015 examiner did not provide an opinion regarding whether the Veteran's left leg disability was directly related to his period of service, including his August 1989 and May 1991 left leg injuries. 

Given the above, the claims file should be returned to the February 2015 examiner, if available, in order to obtain opinions regarding whether the Veteran's left leg disability has been aggravated (permanently worsened beyond normal progress of the disorder) by his service-connected lumbar spine disability and whether the Veteran's left leg disability arose during service or is otherwise related to any incident of service. See McLendon v. Nicholson, 20 Vet. App. 79 (2006). 

Regarding the right hip disability, the Board notes that although the February 2015 examiner provided an opinion and rationale regarding whether the Veteran's right hip disability was due to his lumbar spine disability, he provided no opinion regarding whether the Veteran's right hip disability was aggravated by his lumbar spine disability. 38 C.F.R. § 3.310; Allen, 7 Vet. App. 439. Therefore, the claims file should be returned to the February 2015 examiner, if available, in order to obtain an opinion regarding whether the Veteran's right hip disability has been aggravated (permanently worsened beyond normal progress of the disorder) by his service-connected lumbar spine disability. See McLendon v. Nicholson, 20 Vet. App. 79 (2006). 

With respect to the Veteran's right knee disability, the Board notes that the February 2015 examiner did not provide an opinion regarding whether the Veteran's right knee disability was due to or aggravated by his lumbar spine disability. Therefore, the claims file should be returned to the February 2015 examiner, if available, in order to obtain an opinion regarding whether the Veteran's right knee disability is due to or aggravated (permanently worsened beyond normal progress of the disorder) by his service-connected lumbar spine disability. See McLendon v. Nicholson, 20 Vet. App. 79 (2006). 

Regarding the Veteran's right ear hearing loss and tinnitus, the Veteran asserts service connection for these disabilities on the basis that he developed the conditions due to non-combat-related acoustic trauma occurring during his period of active service. 

Service personnel records show that the Veteran's military occupational specialty (MOS) was that of general equipment repairman. The Board notes that noise exposure is consistent with the conditions and circumstances of the Veteran's MOS. As such, the Board concedes the occurrence of the in-service noise exposure. 

On VA examination in April 2007, the Veteran complained that he had tinnitus that was described as being an intermittent high-pitched bell-like ringing sound in his right ear only. He reported that it was a sharp momentary sound that occurred several times a day. He indicated that his tinnitus had begun about a year or so ago. 

At a March 2014 VA examination, the examiner reviewed the Veteran's entire claims file. She noted that his MOS had been that of general equipment repairman and that no combat service had been indicated during the Veteran's period of active service from 1966 to 1968. The examiner found that there was no permanent positive threshold shift greater than the normal measurement variability at any frequency between 500 and 6000 Hz for the right ear during active service. She opined that the Veteran's right ear hearing loss was less likely as not related to military service. She explained that the Veteran had normal hearing at the time of separation with no change in his hearing when compared to his enlistment. Regarding tinnitus, the Veteran did not report having any recurrent tinnitus. The examiner opined that it was less likely than not that the Veteran's tinnitus was caused by or a result of military noise exposure. She explained that the Veteran denied tinnitus and that therefore, no nexus could be made to his military noise exposure. 

Although the March 2014 VA examiner provided an opinion with adequate rationale regarding whether the Veteran's right ear hearing loss was related to his period of active service from April 1966 to April 1968, the Board notes that she did not provide an opinion as to whether his right ear hearing loss was related to his period of National Guard service from May 1980 to October 1992. Service treatment records from the Veteran's period of National Guard service show that the Veteran had elevated pure tone thresholds in the right ear in April 1988 and May 1991. As the Veteran is alleging that his right ear hearing loss was due to acoustic trauma, the distinction between whether the Veteran had ACDUTRA or INACDUTRA during his National Guard service is not crucial in this case because the regulations provide for service connection for an injury (i.e. acoustic trauma) incurred during either type of duty training. See 38 U.S.C.A. §§ 101(21), (22), (24); 38 C.F.R. §§ 3.6(a), (c)(1). Given the above, the claims file should be returned to the March 2014 examiner, if available, in order to obtain an opinion regarding whether the Veteran's right ear hearing loss arose during his period of National Guard service or is otherwise related to any incident of National Guard service. See McLendon v. Nicholson, 20 Vet. App. 79 (2006). 

Additionally, although the March 2014 VA examiner based her negative etiology opinion for tinnitus on the fact that the Veteran denied having any current tinnitus, the Board notes that the requirement that a claimant have a current disability before service connection may be awarded for that disability is satisfied when a claimant has a disability present at any time since the filing of the claim, even if no disability is present at the time of the claim's adjudication. McClain v. Nicholson, 21 Vet. App. 319 (2007). In this case, even though the March 2014 examiner found no tinnitus, the April 2007 VA examination shows that the Veteran had a diagnosis of tinnitus. Given the above, the claims file should be returned to the March 2014 examiner, if available, in order to obtain an opinion regarding whether the Veteran's diagnosed tinnitus arose during his period of service or is otherwise related to any incident of service. See McLendon v. Nicholson, 20 Vet. App. 79 (2006). 

Relevant ongoing medical records should be requested. 38 U.S.C.A. § 5103A(c) (West 2002); see also Bell v. Derwinski, 2 Vet. App. 611 (1992) (VA medical records are in constructive possession of the agency, and must be obtained if the material could be determinative of the claim). 

Accordingly, the case is REMANDED for the following action:

1. The Veteran should be requested to provide the names, addresses and approximate dates of treatment of all medical care providers, VA and non-VA, who have treated him for his heart disability, left leg disability, right hip disability, and right knee disability that he has not already provided. After the Veteran has signed the appropriate releases, those records should be obtained and associated with the claims folder. Appropriate efforts must be made to obtain all available VA treatment records. All attempts to procure records should be documented in the file. If the AMC/RO cannot obtain records identified by the Veteran, a notation to that effect should be inserted in the file. The Veteran is to be notified of unsuccessful efforts in this regard, in order to allow him the opportunity to obtain and submit those records for VA review.
 
2. Schedule the Veteran for an appropriate VA examination to obtain a medical opinion clarifying whether the Veteran has a current heart disability, to include coronary artery disease and hypertension, that is related to his period of service. The claims file must be provided to and be reviewed by the examiner. Any tests or studies deemed necessary should be conducted, and the results should be reported in detail. 

The examiner should provide an opinion as to whether it is at least as likely as not (50 percent or greater probability) that any current heart disability, to include coronary artery disease and hypertension, is due to the Veteran's periods of service, to include myocardial infarctions occurring during his National Guard service in September 1989 and November 1991. 

The examiner should consider the Veteran's lay statements with regard to onset and continuity of symptomatology of his disorder. Each opinion provided must be fully explained with a complete discussion of the evidence of record and sound medical principles, which may reasonably explain the medical guidance in the study of this case.

3. Return the examination report and claims file to the examiner who conducted the February 2015 VA examination, if available. The examiner should once again review the claims file. 

a) The examiner should specifically identify all left leg disabilities. For each left leg disability identified, the examiner should provide an opinion as to whether it is at least as likely as not (50 percent or greater probability) that any current left leg disability is due to the Veteran's period of service, to include an August 1989 fall during his National Guard service and a May 1991 left foot/leg injury during a field exercise in his National Guard service. 

b) If not caused by or related to service, the examiner should provide an opinion as to whether the Veteran's left leg disability is AGGRAVATED (permanent worsening of the underlying disability beyond natural progress) by the service-connected lumbar spine disability. If aggravation by a service-connected disability is found, then the examiner should quantify the degree of such aggravation, if possible. 

The examiner should explain the medical basis for the conclusions reached. If the examiner determines that an examination of the Veteran is necessary to provide the requested opinion with rationale, then such examination should be scheduled. If the previous examiner is no longer available, then the requested opinions with rationale should be rendered by another qualified examiner. 

4. Return the examination report and claims file to the examiner who conducted the February 2015 VA examination, if available. The examiner should once again review the claims file and provide an opinion as to whether it is at least as likely as not (50 percent or greater probability) that any current right hip disability is AGGRAVATED (permanent worsening of the underlying disability beyond natural progress) by the service-connected lumbar spine disability. If aggravation is found, then the examiner should quantify the degree of such aggravation, if possible. The examiner should explain the medical basis for the conclusion reached. 

If the examiner determines that an examination of the Veteran is necessary to provide the requested opinion with rationale, then such examination should be scheduled. If the previous examiner is no longer available, then the requested opinion with rationale should be rendered by another qualified examiner. 

5. Return the examination report and claims file to the examiner who conducted the February 2015 VA examination, if available. The examiner should once again review the claims file. 

a) The examiner should provide an opinion as to whether it is at least as likely as not (50 percent or greater probability) that any current right knee disability was caused by or related to his service-connected lumbar spine disability.

b) If not caused by or related to the Veteran's service-connected lumbar spine disability, the examiner should provide an opinion as to whether the Veteran's right knee disability is aggravated (permanent worsening of the underlying disability beyond natural progress) by the service-connected lumbar spine disability. If aggravation by a service-connected disability is found, then the examiner should quantify the degree of such aggravation, if possible. 

The examiner should explain the medical basis for the conclusions reached. If the examiner determines that an examination of the Veteran is necessary to provide the requested opinion with rationale, then such examination should be scheduled. If the previous examiner is no longer available, then the requested opinions with rationale should be rendered by another qualified examiner. 

6. Return the examination report and claims file to the examiner who conducted the March 2014 VA audiological examination, if available. The examiner should once again review the claims file. 

The examiner should provide an opinion as to whether it is at least as likely as not (50 percent or greater probability) that any current right ear hearing loss is due to the Veteran's period of National Guard service. The examiner must consider the Veteran's elevated pure tone thresholds in the right ear in April 1988 and May 1991 in rendering her opinion. 

The examiner should explain the medical basis for the conclusions reached. If the examiner determines that an examination of the Veteran is necessary to provide the requested opinion with rationale, then such examination should be scheduled. If the previous examiner is no longer available, then the requested opinions with rationale should be rendered by another qualified examiner. 

7. Return the examination report and claims file to the examiner who conducted the March 2014 VA audiological examination, if available. The examiner should once again review the claims file. 

The examiner should provide an opinion as to whether it is at least as likely as not (50 percent or greater probability) that any current tinnitus is due to the Veteran's period of service, to include noise exposure therein. The examiner is advised that even if the Veteran does not have a current diagnosis of tinnitus on examination, she must still consider the Veteran's previous diagnosis of tinnitus at his April 2007 VA examination in rendering her opinion. 

The examiner should explain the medical basis for the conclusions reached. If the examiner determines that an examination of the Veteran is necessary to provide the requested opinion with rationale, then such examination should be scheduled. If the previous examiner is no longer available, then the requested opinions with rationale should be rendered by another qualified examiner. 

8. After the development requested above has been completed, the record should again be reviewed. If any benefits sought on appeal remain denied, the Veteran and his representative should be furnished with a supplemental statement of the case and be given the opportunity to respond thereto. The case should then be returned to the Board for further appellate consideration, if in order. 

The appellant has the right to submit additional evidence and argument on the matter or matters the Board has remanded. Kutscherousky v. West, 12 Vet. App. 369 (1999).






This claim must be afforded expeditious treatment. The law requires that all claims that are remanded by the Board of Veterans' Appeals or by the United States Court of Appeals for Veterans Claims for additional development or other appropriate action must be handled in an expeditious manner. See 38 U.S.C.A. §§ 5109B, 7112 (West 2014).




______________________________________________
WAYNE M. BRAEUER
Veterans Law Judge, Board of Veterans' Appeals



Department of Veterans Affairs